**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| Pamala Thomas, )<br><br>        Plaintiff, )<br><br>   vs. )<br><br>  )<br><br>Transunion, LLC, )<br>Equifax Information Services, LLC, )<br>Experian Information Solutions, Inc., )<br>Self Financial, Inc. )<br>d/b/a Lead Bank, )<br>Credit One Bank, N.A., )<br>       Defendants. | Case No.: 2:21-cv-02241-BWA-KWR |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT**
**TRANSUNION, LLC'S MOTION TO DISMISS**

**DAVID S. MOYER, LLC**

*/s/ David S. Moyer*
David S. Moyer, Esq.
13551 River Road
Luling, LA 70070
Tel: 985-308-1509
Fax: 985-308-1521
davidmoyerlaw@gmail.com

**STEIN SAKS, PLLC**

*/s/ Yaakov Saks*
Yaakov Saks, Esq.
One University Plaza, Suite 620
Hackensack, NJ, 07601
Tel: 201-282-6500
Fax: 202-282-6501
ysaks@steinsakslegal.com
Pro Hac Vice Admitted

I.      **INTRODUCTION**

Plaintiff brings this Complaint under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C.

§ 1681 *et seq.*, alleging that it is inaccurate and materially misleading to continue reporting her

Self Financial, Inc. d/b/a Lead Bank ("Self Financial") account as 60 days past due when the

account had been fully paid off and closed.  Numerous courts have upheld similar claims,

especially whereas here the account was paid and the debtor has no further liability to the

original creditor.  Defendant argues that reading the report as a whole, and considering the

additional notations regarding the balance, closed and last updated on December 24, 2019, a

reasonable creditor would read this as historical information.  This is plainly rebutted by the

account status section of the credit report.  The payment history does a fine enough job on its

own of communicating historical delinquencies without the need for further clarifying

information from the account status section, which is clearly intended not as a supplement to the

payment history, but as an additional factor to consider in determining a debtor's

creditworthiness, that is, the present status of the account.

Moreover, the reality in the credit industry is an altogether different situation from what

Defendant envisages.  The algorithms that calculate a consumer's credit score do not engage in

the kind of reasonable weighing of different relevant factors to arrive at a conclusion about the

nature (*i.e.*, current or historical) of the challenged line item.  Those algorithms take it at face

value that the 60-day-past-due status reflects a current delinquency on the account and use that as

one factor in calculating the credit score.  To claim that the account status section is merely

historical information under these circumstances simply ignores economic reality, and does

violence to the FCRA, which was intended as a vehicle to ensure the accuracy of information

communicated to potential creditors.

## II.    **STATEMENT OF FACTS**

Defendant Transunion prepared and issued a credit report that contained inaccurate and materially misleading information regarding Plaintiff's account with Defendant Self Financial. Dkt. # 1, ¶ 18.  The information was inaccurate because the "Pay Status" section indicates that the Self Financial account is 60 days past due despite the fact that it had been closed with a $0 balance.  *Id.* at ¶¶ 19, 20.  Far from being viewed in a wholistic fashion by potential creditors, the account status section is the subject of ministerial calculations by credit-scoring algorithms which take it for granted that the account status reflects the current status of the account.  *Id.* at ¶ 22.  Incorporating other relevant factors in a tradeline, each representing a discrete piece of information, the algorithms then generate a credit score based on that assumption.  *Id.*  Virtually all lending decisions by creditors are based on these automatically generated scores.  *Id.* at ¶ 23.

Plaintiff disputed Defendant's inaccurate credit reporting by sending a dispute letter to Defendant Transunion dated June 24, 2020.  Dkt. # 1, ¶ 26.  It is believed that Defendant Transunion notified Self Financial of the disputed inaccuracy.  *Id.* at ¶ 27.  Self Financial failed to conduct a reasonable investigation into Plaintiff's dispute and continued reporting the inaccurate, derogatory information.  *Id.* at ¶¶ 28, 29.

Transunion likewise failed to conduct a reasonable investigation into Plaintiff's dispute. Dkt. # 1, ¶ 30.  A reasonable investigation would have revealed to Transunion that it was inaccurate and materially misleading to report two contradictory line items showing both a $0 balance and a payment status that is currently 60 days late.  *Id.* at ¶¶ 19, 20, 32.  Instead of recognizing this inaccurate information, Transunion continued to publish it.  *Id.* at ¶ 34.

## III.    **STANDARD OF REVIEW**

Dismissal under Rule 12(b)(6) is warranted if the "complaint does not contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 734 (5th Cir. 2019)(quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))).  This sets forth the plausibility standard which requires "a court to infer more than the mere possibility of misconduct" in order for a pleader to show that he is entitled to relief.  *Walker*, 938 F.3d at 734 (quoting and citing *Iqbal*, 556 U.S. at 678 (internal citations omitted)).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Walker*, 938 F.3d at 735 (quoting *Twombly*, 550 U.S. at 555).  From the well-pleaded facts, the court must be able "to draw the reasonable inference that the defendant is liable for the misconduct alleged."  938 F.3d at 735 (quoting 550 U.S. at 555).  "[A] well-pleaded complaint may proceed[, however,] even if it appears that a recovery is very remote and unlikely."  938 F.3d at 735 (quoting 550 U.S. at 556).

## IV.   LEGAL ARGUMENT

### A.   REPORTING A PAID-OFF DEBT AS 60-DAYS PAST DUE IS PATENTLY INACCURATE AND MATERIALLY MISLEADING UNDER THE FCRA

"Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). And when a consumer disputes "the completeness or accuracy of any item of information" in the credit report and notifies the consumer reporting agency of such, "the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file."  *Id.* § 1681i(a)(1)(A).

There are several elements under § 1681e(b) and § 1681i(a)(1)(A).  *See Potter v. Greensky, LLC*, No. 5:19-cv-00581-JKP, 2019 U.S. Dist. LEXIS 180517, *4-5 (W.D. Tex. Oct. 18, 2019).  Plaintiff brings her claims against Transunion under both sections.  *See* Dkt. # 1, ¶¶ 53, 60.  The unifying aspect of both claims is the plaintiff's burden of proving an inaccuracy in her credit report.  *Hurst v. Equifax Info. Servs., LLC*, No. SA-20-CV-1366-JKP-ESC, 2021 U.S. Dist. LEXIS 239227, at *12 (W.D. Tex. Dec. 15, 2021)(citation omitted).  "A credit entry may be 'inaccurate' within the meaning of the statute either because it is patently incorrect, or because it is misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions."  *Sepulvado v. CSC Credit Servs., Inc.*, 158 F.3d 890, 895 (5th Cir. 1998).

Transunion takes issue with the accuracy requirement and cites to an out-of-Circuit case, *Erickson v. First Advantage Background Servs. Corp.*, 981 F.3d 1246 (11th Cir. 2020), which recently adopted the materially misleading standard under the FCRA.  *See Erickson*, 981 F.3d at 1251-52. While it is true that the Eleventh Circuit cautioned that "the fact that some user somewhere could possibly squint at a report and imagine a reason to think twice about its subject would not render the report objectively misleading[,]" 981 F.3d at 1252, this was only a gloss on the materially misleading standard that continued a line of caselaw in the Eleventh Circuit demonstrating a commitment to "interpret[ing] [credit reports] in an evenhanded manner toward the interests of both consumers and potential creditors in fair and accurate credit reporting."  *See Id.* at 1252 (explaining that in *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151 (11th Cir. 1991), "any 'maximum possible accuracy' standard must be applied objectively.")(citing *Cahlin*, 936 F.2d at 1158).  And while the *Erickson* court was certainly right to suggest that the issue of accuracy is an objective measure that must consider both sides to arrive at a determination of whether a credit report is accurate, that does not undo the reasonable inferences that must be

drawn in favor of Plaintiff on a motion to dismiss under the federal rules.  As will be seen below,

many courts have upheld nearly identical claims due to the procedural posture of the case, where

expert determinations cannot be made on a credit report's meaning without additional discovery.

In *Barrow v. Trans Union, LLC*, No. 20-CV-3628, 2021 U.S. Dist. LEXIS 72503 (E.D.

Pa. Apr. 9, 2021), for example, the court upheld a similar claim on a motion to dismiss alleging

that it was materially misleading to continue reporting an account as "120 days past due" in the

pay status section when the account had been closed and zeroed out due to a refinance on the

loan.  *See Barrow*, No. 20-CV-3628, 2021 U.S. Dist. LEXIS 72503 at *2-3.  The court's

reasoning is particularly relevant here:

> ***Reading the report as a whole***, we can conceive of several different, plausible
> meanings which may be ascribed to these remarks from the perspectives of a
> typical, reasonable reader and a typical, reasonable creditor. However, speculation
> is not our function to perform in ruling on a Rule 12(c) motion. Rather, we are to
> consider the pleadings together with those documents "that are attached to or
> submitted with the complaint, and any matters incorporated by reference or
> integral to the claim, items appearing in the record of the case, and any
> "undisputedly authentic documents attached to the motion," accept all factual
> averments as true and draw all reasonable inferences in favor of the non-moving
> party. Judgment should not be granted under Rule 12(c) "unless the movant
> clearly establishes that no material issue of fact remains to be resolved and that he
> is entitled to judgment as a matter of law."

*Barrow*, No. 20-CV-3628, 2021 U.S. Dist. LEXIS 72503 at *14 (emphasis added)(citations

omitted).  The court considered an abundance of different line items on the credit report, many of

which are not even available here, and yet denied the defendant's motion (the same Defendant

here, Transunion), on the basis that multiple competing inferences could be drawn from the

credit report and therefore the question of accuracy was best left to a jury.  *See Barrow*, No. 20-

CV-3628, 2021 U.S. Dist. LEXIS 72503 at *13-14.

A similar claim was upheld in *Smith v. Trans Union, LLC*, No. 20-4903, 2021 U.S. Dist.

LEXIS 51937 (E.D. Pa. Mar. 19, 2021).  Trans Union argued that the account status was merely

historical in light of the additional notation that the account had not been updated since 2016.

*See Smith*, No. 20-4903, 2021 U.S. Dist. LEXIS 51937 at *6-7.  The court rejected that

argument, reasoning:

> This case presents a different situation. Here, the debt was paid in full to the
> penny at the time it was closed, and yet the "Pay Status: Account 60 Days Past
> Due" notation would lead one to believe the account was past due and continued
> to be past due, or not fully paid, when the balance was zeroed out when it was
> closed. This is clearly a black mark on the credit report of an individual seeking
> credit. At the time of the closing, the debt was fully paid and the account made
> current. Defendant's cases actually prove Plaintiff's point—the phrase "60 Days
> Past Due" could mislead a creditor to believe the account was never paid off
> because that is what the plaintiffs' credit reports said in Defendant's cited cases,
> and indeed the account balances had never been paid in full.

*Id.* at *9-10 (distinguishing *Settles v. Trans Union, LLC*, No. 3:20-cv-00084, 2020 U.S. Dist.

LEXIS 220341 (M.D. Tenn. Nov. 24, 2020); *Hernandez v. Trans Union LLC*, No. 3:19cv1987-

RV/EMT, 2020 U.S. Dist. LEXIS 249358 (N.D. Fla. Dec. 10, 2020)).

> Moreover, the court provided singular insight into plaintiff's claim as follows:

> It is also not indisputably accurate to say that the notation is a remark on the
> historical pay status of the account. An historical remark would say something to
> the effect that "at one time in the past the account was past due," or "paid in full
> at end when account was 60 days past due," rather than indicating, as it does in
> this case, "Pay Status: 60 Days Past Due." What Plaintiff has shown on his
> current credit report certainly appears to be a current status, and not an historical
> remark.

*Smith*, No. 20-4903, 2021 U.S. Dist. LEXIS 51937 at *9-10.

> *Mund v. Transunion*, No. 18-cv-6761(BMC), 2019 U.S. Dist. LEXIS 31289 (E.D.N.Y.

Feb. 27, 2019) upheld a similar claim.  *Mund*, No. 18-cv-6761(BMC), 2019 U.S. Dist. LEXIS

31289 at *6-7.  The plaintiff argued that it was materially misleading to continue reporting a

"pay status" of "120 days past due" on an account that had been closed and transferred to another

lender with a $0 balance.  No. 18-cv-6761(BMC), 2019 U.S. Dist. LEXIS 31289 at *6-7.  The

court accepted these arguments and noted that the defendant's explanation of all the line items

6

(*i.e.* a closed and transferred account, $0 balance, and "pay status" of "120 days past due"), while potentially true as a technical matter, did not erase the misleading impression that the credit report gave to creditors.  *Id.* at *7. ("[The plaintiff's] point is that, even if this information is factually or technically accurate, the way in which that information appears on the credit report is misleading in a material way to potential lenders. This is enough to withstand defendant's motion to dismiss.")(citing *Hillis v. Trans Union, LLC*, 969 F. Supp. 2d 419, 421 (E.D. Pa. 2013)("If [p]laintiff can prove that [defendant's] reporting was misleading enough to cause him harm, he may have an actionable claim under the FCRA. At this early stage in the litigation, this Court is not prepared to rule, as a matter of law, that he does not.")(internal quotations omitted)).

    *Friedman v. Citimortgage, Inc.*, No. 18 CV 11173 (VB), 2019 U.S. Dist. LEXIS 149706 (S.D.N.Y. Sep. 3, 2019), another similar claim, came to the same conclusion.  The court held that the

> plaintiff sufficiently alleges the trade line on his credit report is misleading in a way that could adversely affect lenders' credit decisions. According to plaintiff, because CitiMortgage continues to report that plaintiff owes a balance—even if that balance is $0—and reports that balance as 120 days late, lenders believe plaintiff is currently delinquent, negatively affecting potential lenders' perception of plaintiff's creditworthiness.

*Friedman*, No. 18 CV 11173 (VB), 2019 U.S. Dist. LEXIS 149706 at *8.

    These cases do not stand in isolation either.  Building on *Mund* and *Friedman*, *Huggins v. FedLoan Servicing*, Civil Action No. 19-21731 (ES) (CLW), 2020 U.S. Dist. LEXIS 229290 (D.N.J. Dec. 2, 2020) found that a credit report that "had a $0 balance and a pay status of 120 days delinquent … paints a materially misleading picture of Huggins's pay status in that it may lead potential lenders to believe Huggins is currently late on his payments."  *Huggins*, Civil Action No. 19-21731 (ES) (CLW), 2020 U.S. Dist. LEXIS 229290 at *16.  Like *Smith*, the court distinguished *Settles*, No. 3:20-cv-00084, 2020 U.S. Dist. LEXIS 220341 at *10 (finding

persuasive the fact that "Plaintiff admits that never brought the account current — instead, he

defaulted, and the account was closed while it was more than 120 days past due.") by noting that

"…Huggins's loan was transferred to another lender, and he contends that he *did* bring it current

by transferring it to reflect a balance of $0." *See Huggins*, Civil Action No. 19-21731 (ES)

(CLW), 2020 U.S. Dist. LEXIS 229290 at *18 (citing and quoting *Settles*, No. 3:20-cv-00084,

2020 U.S. Dist. LEXIS 220341 at *10)(internal quotations omitted)(emphasis in original).   In

other words, *Huggins* was challenging the basic notion that the historical information argument

carried any weight at all in light of the current status of the account *at the time of transfer*.   Even

accepting *arguendo* that the account status notation represents the transfer of the account *as*

*historical fact*, it actually *had* been current when the account was transferred.   *Huggins*, Civil

Action No. 19-21731 (ES) (CLW), 2020 U.S. Dist. LEXIS 229290 at *18.

Other courts have ruled in similar fashion.[1]   Finally, a case in the Eleventh Circuit ruled

in favor of the plaintiff on an identical claim on a motion to dismiss.   *See Drexler v. Trans*

*Union, LLC*, No. 8:20-cv-2366-30JSS, 2020 U.S. Dist. LEXIS 248631, at *4 (M.D. Fla. Dec. 15,

2020).   The defendant Trans Union argued, as it does here, that the pay status section merely

represented historical information when considered in the overall context of the credit report, a

---

[1] *See Soler v. Trans Union, LLC*, No. CV 20-8459 DSF (PLAx), 2020 U.S. Dist. LEXIS 232987, at *5-7 (C.D. Cal. Dec. 1, 2020)(holding that it was inaccurate to report "pay status" as "120 days past due" on an account that had been fully satisfied with a $0 balance, and rejecting Trans Union's argument that the 120 day delinquency was merely historical information for a discrete time period when considered in the overall context of the account being closed with a $0 balance, noting, "Without Trans Union's annotation, explanation, and supplemental documentation, a jury could find that the Credit Report on its face is misleading in such a way that it adversely affects [the plaintiff's] credit."); *see also Macik v. JPMorgan Chase Bank, N.A.*, No. G-14-044, 2015 U.S. Dist. LEXIS 185257, at *7-8 (S.D. Tex. May 28, 2015)(while noting that the "[plaintiff] has acknowledged that the information concerning the 90 days past due status on her mortgage with Chase was correct *in 2009*," finding that "the cornerstone of her claim is that, given the manner in which Chase has presumably coded her prior account, the information is inaccurately being reported as a 'current' delinquency *in 2013*.")(emphasis in original).

portion of which it attached to the record. *Drexler*, No. 8:20-cv-2366-30JSS, 2020 U.S. Dist. LEXIS 248631, at *4. Even considering that additional information, however, the court still deferred the ultimate question of accuracy to the summary judgment stage when a fuller record had been developed before it. *See* No. 8:20-cv-2366-30JSS, 2020 U.S. Dist. LEXIS 248631, at *4. ("The Amended Complaint's factual allegations must be taken as true and Plaintiff is entitled to the benefit of every favorable inference, including the inference that the payment status field represents current, as opposed to historical account information.").

Here, there is no question what "Account Status" means in the context of a credit card account. "Status" is the current status of the account.[2] As *Smith* made explicit, it is "not

---

[2] Some courts have concluded that interpreting the account status field to mean "current status" would mean reading non-existent present tense language into the phrase "account status." *See e.g. Bibbs v. Trans Union LLC*, 521 F. Supp. 3d 569, 580 (E.D. Pa. 2021)("Ms. Bibbs is essentially asking us to read in non-existing present tense language into the 'Pay Status' field…"). Such a position is starkly at odds with the consensus of the English-speaking world, as exemplified by academics, linguists and grammarians, who have all generally recognized the tautology of the phrase "*current* status." In a style guide to students, for example, The University of Sheffield points out,

**Redundant Modifiers**
A redundant modifier uses an adjective or adverb that simply restates the word it modifies. e.g., true facts, important essentials, final outcome, end result, terrible tragedy. Remove the first word.
…
***Current Status***
…
Student Services Information Desk, The University of Sheffield, https://www.sheffield.ac.uk/polopoly_fs/1.481754!/file/List-of-Redundant-Modifiers.pdf, last visited January 17, 2022 (emphasis in bold italics added).
The same is true in business writing, which famously employs a no-nonsense, straightforward writing style. *See* https://ontariotraining.net/writing-style-redundant-phrases/, last visited January 17, 2022 ("***However, when writing in the business world I believe current status is redundant.*** If I give you the status of a project, it is what is true now. Adding the additional word 'current' does not change or add to the message.")(emphasis added).
Therefore, *Bibbs'* conclusion that some additional clarifying language is needed to make plain what the English language easily conveys on its own is a curious position to take,

indisputably accurate to say that the notation is a remark on the historical pay status of the account.  No. 20-4903, 2021 U.S. Dist. LEXIS 51937 at *10.  "What Plaintiff has shown on his current credit report certainly appears to be a current status, and not an historical remark."  *Id.* at *10.

This conclusion is bolstered by recent caselaw interpreting the most recent amendments to the FCRA under the CARES Act, which requires furnishers to report an account as current if the consumer enters into an agreement to defer one or more payments due to financial hardship because of the COVID-19 pandemic.  *See* 15 U.S.C. § 1681s-2(a)(1)(F)(ii).  In rejecting a similar claim where the plaintiff had argued that the CARES Act amendments required furnishers to erase all mention of a delinquency during the covered period of the forbearance, the court in *Mitchell v. Specialized Loan Servicing LLC*, No. 2:20-cv-10455-SB-PD, 2021 U.S. Dist. LEXIS 246880 (C.D. Cal. Dec. 27, 2021) distinguished between the payment history section, which contained historical information where it was appropriate to list the delinquent status of the account prior to the forbearance, and the tradeline's account status, which was appropriately updated to "current" under § 1681s-2(a)(1)(F)(ii) when the forbearance started.  *Mitchell*, No. 2:20-cv-10455-SB-PD, 2021 U.S. Dist. LEXIS 246880 at *9 (after noting that the § 1681s-2(a)(1)(F)(ii) makes no mention of the payment history profile, finding that the defendant complied with that provision by "reporting the *account status* of Plaintiff's loan as 'current.'")(emphasis added).

Contrary to Defendants' arguments, Plaintiff's claim is further bolstered by *Cahlin*.  That case involved a plaintiff's challenge to the way a charge off was being reported on his GMAC

---

especially when academics and business writers have understood the plain meaning of the term "status."

account.  *See Cahlin*, 936 F.2d at 1155.  When GMAC initially charged off the debt, it reported

the account as an "I-9" status, or charge off.  936 F.2d at 1155.  Dissatisfied with this reporting,

the plaintiff wrote a letter requesting that the status be reported as an "I-1."  *Id.* at 1155.  GMAC

complied, albeit only slightly.  *Id.* at 1155.  It changed the status of the account to an "I-1" as

requested, but moved the "I-9" notation to the payment history section, thus signifying that the

account had been a charge off at some previous point in time.  *Id.*  When GMAC later disclaimed

this move in a deposition, testifying that it had been its intent to wipe the tradeline completely

clean of any mention of the charge off in compliance with the plaintiff's request, the court

disagreed.  *Id.* at 1159.

> Viewed in the light most favorable to Cahlin, the facts show that GMAC in June,
> 1986 believed that the Cahlin account was accurately reported as being a bad debt
> with a zero balance, but agreed in October, 1986 to inform CBI to change the
> reporting of the account under the threat of litigation. This change of heart,
> however, does not erase the historical fact that until at least June, 1986, GMAC
> was reporting to CBI that the Cahlin account was a bad debt.  It was this
> information that was conveyed by CBI's report when it moved the "I9" rating to
> the previous history section of Cahlin's account. Thus, the notation was an
> "accurate" reflection of how GMAC had been reporting this account to CBI in the
> past. Nothing contained in GMAC's terse letter of October 9 instructs CBI to
> eradicate GMAC's own past characterizations of the account from future credit
> reports.

*Id.* at 1159-60.  In other words, the *Cahlin* court specifically rejected the notion that all mention

of the charge off should disappear entirely from the report, and agreed with the initial, albeit

accidental, impulse of the defendant to move the "I-9" (*i.e.* charge off notation) to the payment

history section, while retaining the current status as "I-1," reflecting that the debt had

subsequently been paid off.  *Id.*

Given the actual facts of this case, Defendant's reliance on *Cahlin* is odd to the say the

least.  *Cahlin* stands for the proposition that past derogatory information should remain on the

credit report, but only with reference to the payment history section.  936 F.2d at 1159-60.  The

larger rhetoric of that case is firmly limited to its factual context.  For example, the statement

routinely cited by the courts that, "[a]lthough a credit reporting agency has a duty to make a

reasonable effort to report 'accurate' information on a consumer's credit history, it has no duty to

report only that information which is favorable or beneficial to the consumer[,]" *see Cahlin*, 936

F.2d at 1158, makes sense in the limited context of the payment history, which adequately

conveys the past due history of the account without the need for supplemental information.  It

makes no sense at all, however, in the context of the account status section, which reflects the

current status of the account.  *Cahlin* intuitively understood this, and its assumption along those

lines forms the entire basis for *Cahlin*'s disagreement with GMAC's later retrenchment.  *See* 936

F.2d at 1159-60.  In the face of *Cahlin* and *Mitchell*, Defendant's position is untenable.

       Defendant nevertheless argues that a reasonable creditor would not be misled into

thinking that the Self Financial account is currently delinquent because of additional notations in

the credit report regarding the $0 balance, the date the account was last updated and closed on

December 24, 2019, the fact that the account was closed, and the two prior monthly

delinquencies of 30 and 60 days, respectively, in the months leading up to closure of the account.

*See* Dkt. # 24, at 6.  At bottom, the question comes down to how a credit reporting agency

continues to characterize an account that has been fully satisfied in the same month that it was

reported delinquent.  *See* Dkt. # 24-1, at 9 (showing date closed and last payment made on

December 24, 2019, a $0 balance and a 60-day delinquency in December 2019, a maximum

delinquency in December 2019, and 60 days past due in the account status section).  The basic

contention here is that the account status is a separate, discrete line item in the credit report that

carries with it an independent duty to communicate concrete information about the nature of the

account or tradeline, and no amount of intellectual jockeying, interpretation, or willful reading

into the other aspects of the credit report will change that fact, as alleged.  The cases cited by Defendant essentially boil the credit report into one piece of information, and ask the question of whether that single piece of information adequately conveys the posture of the account.  But that is the wrong question to ask.  As *Cahlin*, *Smith* and others recognize, the account status is responsible for conveying discrete information about the current status of the account, irrespective of and in addition to the payment history section, which is an entirely different section.  Since the account status is so blatantly contrary to the status of the account as paid off – *i.e.*, it is literally impossible for an account to be 60 days past due in the same month that it was fully satisfied – the report is technically inaccurate and materially misleading on the critical point of satisfaction of the debt.

*Erickson* and others, while perhaps guided by good intentions in balancing the interests of both creditor and debtor in determining whether a report is accurate, would subvert the "maximum possible accuracy" standard that applies to credit bureaus and essentially enslave it to the dictates of the credit reporting industry.  Far from balancing the interests of both debtor and creditor, it takes the basic protections of the FCRA and subordinates them to the creditor.  Many of the cases Defendant relies on have the effect of subordinating the Rule 12(b)(6) standard where all reasonable inferences are to be drawn in Plaintiff's favor, adopting a *de facto* reading of the credit report that is advanced by the defendant credit bureau or furnisher, and taking *those* inferences as true on the dispositive motion. *See O'Neal v. Equifax Info. Servs.*, No. 21-CV-80968-RAR, 2021 U.S. Dist. LEXIS 206883, at *6 (S.D. Fla. Oct. 27, 2021)(reading an account that "(1) has a balance of $0; (2) was last updated on July 30, 2018; (3) was closed on July 30, 2018; (4) was 120 days past due in June and July 2018, prior to its closure on July 30, 2018; and (5) is closed[]" as meaning that the 120-day payment delinquency in the account status section is

merely historical information); *see also Brown v. Trans Union, LLC*, No. 8:21-cv-2371-VMC-JSS, 2022 U.S. Dist. LEXIS 20771, at *8-11 (M.D. Fla. Feb. 4, 2022)(coming to the same conclusion based on largely identical reasoning)(citing cases for same); *Cf. Drexler*, No. 8:20-cv-2366-30JSS, 2020 U.S. Dist. LEXIS 248631, at *4 ("The Amended Complaint's factual allegations must be taken as true and Plaintiff is entitled to the benefit of every favorable inference, including the inference that the payment status field represents current, as opposed to historical account information."); *cf. Barrow*, No. 20-CV-3628, 2021 U.S. Dist. LEXIS 72503 at *14 (Reading the report as a whole, we can conceive of several different, plausible meanings which may be ascribed to these remarks from the perspectives of a typical, reasonable reader and a typical, reasonable creditor.  However, speculation is not our function to perform in ruling on a Rule 12(c) motion.").  This Court should not fall prey to the temptation to do away with a case under the guise of well-packaged argument, neatly tied in a bow, when the reality is messier and belies the arguments made therein.

**B.  ALGORITHMS THAT CALCULATE CREDIT SCORES INTERPRET THE "PAY STATUS" SECTION AS A CURRENT DELINQUENCY, NEGATIVELY IMPACTING CREDIT SCORES**

Credit-scoring algorithms are directed to interpret the account status section as the current status of the account, regardless of additional notations on the tradeline.  Contrary to the assumptions that were made in *Erickson*, human beings are not the ones responsible for making reasonable assumptions about the nature of certain line items in a tradeline and then draw conclusions about the tradeline as a whole.  *See Erickson*, 981 F.3d at 1253 ("A reasonable user would not take adverse action against Erickson based on this report because the only reasonable understanding of it was that someone with Erickson's name was a registered sex offender in Pennsylvania—not that Erickson himself was that person.").  This is an unavoidable reality of the credit reporting industry, which relies on these algorithms to generate credit scores, which are

in turn used for making credit decisions.  The reporting of a delinquency in the account status section is therefore not only harmful derogatory information, but represents a *de facto* inaccuracy.

Cases involving deviation from the Metro 2 Guidelines where the industry standard is to follow those guidelines to a tee, regardless of any additional notation in the report, are instructive.  In *Cristobal v. Equifax, Inc.*, No. 16-cv-06329-JST, 2017 U.S. Dist. LEXIS 63571 (N.D. Cal. Apr. 26, 2017), the court noted

> Under Cristobal's theory, her credit report deviated from Metro 2 because the CII field was left blank when it should have been filled with code "D." ECF No. 1 ¶¶ 84, 137. That deviation "will prompt those making credit decisions to draw a more negative inference regarding [her] creditworthiness," id. ¶¶ 64-66, and could lower her credit score because FICO's "algorithms" are premised on compliant Metro 2 data, id. ¶¶ 47-49. ***In a world of big data, it is plausible that an algorithm designed to calculate Cristobal's FICO score based on the Metro 2 codes might not generate the same score just because the word "bankruptcy" appears elsewhere on the report.***

*Cristobal*, No. 16-cv-06329-JST, 2017 U.S. Dist. LEXIS 63571 at *13-*14 (emphasis added).

The court in *Conrad v. Experian Info. Sols., Inc.*, No. 16-cv-04660 NC, 2017 U.S. Dist. LEXIS 68641 (N.D. Cal. May 4, 2017) likewise found a violation of the FRCA where the furnisher had refused to supply the code "D" in a pending bankruptcy petition, even considering the possibility that the bankruptcy had been noted elsewhere in the credit report.  *See Conrad*, No. 16-cv-04660 NC, 2017 U.S. Dist. LEXIS 68641 at *16-*17.  Following the lead of *Cristobal*, the court noted in particular,

> Even if the bankruptcy was mentioned elsewhere in the credit report, the Court does not know whether those people making credit decisions about Conrad were aware of his bankruptcy. ***The people making such decisions about Conrad may not have known of the bankruptcy because of the use of algorithms in calculating a consumer's credit score.*** Dkt. No. 15 at 6 ("When FICO calculates credit scores the algorithms use Metro 2 information based on industry standards"). Thus, "[i]n a world of big data, it is plausible that an algorithm designed to calculate [plaintiff's] FICO score based on the Metro 2 codes might not generate the same score just because the word 'bankruptcy' appears elsewhere

on the report." *Cristobal v. Equifax, Inc.*, No. 16-cv-06329 JST, 2017 U.S. Dist.
LEXIS 63571, 2017 WL 1489274, at *5 (N.D. Cal. Apr. 26, 2017). It is therefore
plausible that the failure to comply with industry standards was "misleading in
such a way and to such an extent that it [could] be expected to adversely affect
credit decisions." *Carvalho*, 629 F.3d at 890.

*Conrad*, No. 16-cv-04660 NC, 2017 U.S. Dist. LEXIS 68641 at *17 (emphasis added).

These cases illustrate the modern reality that A.I. will often dictate, as it does here, the

outcomes of credit decisions based on a reporting regime that freely uses an automated process

through algorithms.  These algorithms are blind to the kind of reasonable impressions the

*Erickson* court assumed that potential creditors, acting as human beings, would draw from credit

reports.  Indeed, *Erickson* never addressed this reality, and so its concerns about the conclusions

to be drawn from a credit report by potential creditors reviewing them are of no use here.

The reasoning of two other cases rejecting similar claims outside this jurisdiction, *O'Neal

v. Equifax Info. Servs.*, No. 21-CV-80968-RAR, 2021 U.S. Dist. LEXIS 206883 (S.D. Fla. Oct.

27, 2021) and *Pineda v. Trans Union, LLC*, No. 2:21-cv-653-SPC-MRM, 2021 U.S. Dist. LEXIS

233631 (M.D. Fla. Dec. 6, 2021), is unpersuasive.  *O'Neal*'s chief concern was that the plaintiffs

were simply ignoring the relevant standard under *Erickson*, which directs courts to view credit

reports objectively.  *See* No. 21-CV-80968-RAR, 2021 U.S. Dist. LEXIS 206883 at *8.  But

*Erickson*'s standard was developed with a healthy set of assumptions in mind, specifically that a

creditor would take the time to pore over the details of a credit report and make determinations

of creditworthiness based on a holistic assessment of the report.  *See Erickson*, 981 F.3d at 1253

("Little League knew that it would get what it asked for here—a search based only on first and

last name. And it also knew that it could not attribute any of those matched records to an

applicant without conducting further research first.").

Given the reality that the Account Status section is inaccurately viewed as a current status

of the account by credit scoring algorithms regardless of additional tradelines which might

indicate otherwise, *see Conrad*, No. 16-cv-04660 NC, 2017 U.S. Dist. LEXIS 68641 at *16-*17

("Even if the bankruptcy was mentioned elsewhere in the credit report, the Court does not know

whether those people making credit decisions about Conrad were aware of his bankruptcy."), it

behooves this Court to consider the very real fact that those algorithms operate in such a way as

to defy *Erickson*'s guidance.  The law must keep pace with the times and not be made prisoner to

antiquated notions of the past, else it becomes a relic.[3]

     *O'Neal* expressed the further concern that "[h]ow third-party companies choose to utilize

algorithms to decipher the accurate information reported by Defendant has no bearing on the

accuracy of the report itself."  *See* No. 21-CV-80968-RAR, 2021 U.S. Dist. LEXIS 206883 at *8.

However, as the Eleventh Circuit recognized in *Erickson*, standing in the shoes of the reasonable

creditor, as credit scoring algorithms do in this case, is itself a basis for finding inaccuracies in a

credit report when judged from the perspective of that user.  *See Erickson*, 981 F.3d at 1253 ("A

reasonable user of the report standing in the shoes of Little League…").  Under *Erickson*'s

guidance, one is simply substituted for another.  In this view, Plaintiff's algorithm theory

reaffirms that *some third-party entity* necessarily interacts with the credit report, the inevitable

implications of the *Erickson* standard.  *See* 981 F.3d at 1253.  Here, just as the reasonable user

was imagined to be stepping in the shoes of the actual user in the *Erickson* case, so too do the

credit scoring algorithms stand in the shoes of potential creditors reviewing the BOA tradeline,

---

[3] *See e.g. City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 119 S. Ct. 1624, 728
(1999)(Scalia, A., concurring)(noting that "the attributes of § 1983 could change to keep up with
modern developments in the law of torts: '*Doctrines of tort law have changed significantly over
the past century, and our notions of governmental responsibility should properly reflect that
evolution*.'")(citations omitted)(emphasis added); *see also Malone v. United States* , 791 F.
App'x 543, 546 (6th Cir. 2019)("[G]eneric burglary includes common law burglary—'breaking
and entering a dwelling at night with intent to commit a felony'—*but, it also 'must include more'
than the common law definition to be relevant to 'modern law enforcement concerns*.'")(quoting
*United States v. Stitt*, 139 S. Ct. 399, 405 (2018))(emphasis added).

thus supplanting that reasonable user and making an entirely *unreasonable assertion* about the overall account, one that suggests that the debt was never ultimately satisfied.  This is what the credit report suggests, and how the credit scoring algorithms indeed interpret the account. *Erickson*'s standard is thus unavailing in this context.

Moreover, the notion that Congress should be the only one to update statutes that are waning in relevance compared to the latest technological developments happening in the world, *see Pineda*, No. 2:21-cv-653-SPC-MRM, 2021 U.S. Dist. LEXIS 233631 at *8, has been rejected in other legislative contexts.  Under the Americans with Disabilities Act ("ADA"), for example, courts have expanded the ADA's reach to cover websites without any connection to a physical retail location.[4]  Indeed, cases have consistently recognized the revolutionary changes that have been handed down to our society in a relatively short period of time, and the impact that has had on judicial decision-making.[5]

---

[4] *See Markett v. Five Guys Enters. LLC*, No. 17-cv-788 (KBF), 2017 U.S. Dist. LEXIS 115212, at *4-5 (S.D.N.Y. July 21, 2017)("[T]he text and purposes of the ADA, as well as the breadth of federal appellate decisions, suggest that defendant's website is covered under the ADA, either as its own place of public accommodation or as a result of its close relationship as a service of defendant's restaurants, which indisputably are public accommodations under the statute."); *see also Del-Orden v. Bonobos, Inc.*, 2017 U.S. Dist. LEXIS 209251, at *32 (S.D.N.Y. Dec. 20, 2017)(holding that "the ADA extends to Bonobos' website … because the ADA … applies to private commercial websites as places of 'public accommodation'"); *see also Harty v. Nyack Motor Hotel, Inc.*, No. 19-CV-1322 (KMK), 2020 U.S. Dist. LEXIS 40429, at *9-10 (S.D.N.Y. Mar. 9, 2020)(collecting cases).

[5] *See United States v. Peterson*, 248 F.3d 79, 83 (2d Cir. 2001)(in applying the ADA to the internet, the court remarking, "Computers and Internet access have become virtually indispensable in the modern world of communications and information gathering."); *see also Del-Orden v. Bonobos, Inc.*, 2017 U.S. Dist. LEXIS 209251, at *24 (S.D.N.Y. Dec. 20, 2017)(in applying same, remarking, "Today, few areas are more integral to 'the economic and social mainstream of American life,' than the Internet's websites.")(citation omitted); *see also Packingham v. North Carolina*, 137 S. Ct. 1730, 1735, 198 L. Ed. 2d 273 (2017)(quoting *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 868, 117 S. Ct. 2329, 138 L. Ed. 2d 874 (1997))(in holding that the First Amendment's free speech protections applied to an internet venue, the Court noting, "While in the past there may have been difficulty in identifying the most important

These cases establish a clear proposition that allows courts and the caselaw to evolve their understanding of the law as the world around them changes.  Courts are not bound by narrow proscriptions of the law, or even at times, the literal language of a statute, but may expand that to consider scenarios not initially contemplated by Congress.  Here, that is no great feat of interpretation.  If the courts have seen fit to apply the ADA's public accommodation requirement to internet websites that have no real-world connection to physical establishments, when the statute itself contains no obvious mention of the internet and was passed well before the internet came of age, Congress never having occasion to consider the explosion of online shopping that has dramatically shifted the consumer retail market, then a clear line can be drawn from the third-party interaction necessarily contemplated by *Erickson* in the context of potential creditors, who, *as third parties*, are interpreting credit reports, and credit scoring algorithms which stand in the shoes of those potential creditors and do the interpretive work for them.  This is much less of an interpretive leap than the ADA cases, and *O'Neal*'s and *Pineda*'s decisions stand in clear opposition to the U.S. Supreme Court's general guidance on this issue.

## B.  DEFENDANT'S PUBLICATION OF THE INACCURATE SELF FINANCIAL TRADELINE WAS WILLFUL

Given the obvious inconsistencies in reporting an ongoing 60-day delinquency on an account that had been closed and fully satisfied with a $0 balance, Defendant Transunion willfully violated the FCRA.  These inconsistencies lead to the only conclusion possible under the facts as pled (*and* incorporated): that Transunion did so knowingly and in reckless disregard of the law.

---

places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the 'vast democratic forums of the Internet … .'").

Willfulness under the FCRA requires either a knowing violation or reckless disregard of the law. *Bouton v. Ocean Props.*, No. 16-cv-80502-BLOOM/Valle, 2017 U.S. Dist. LEXIS 174989, at *40 (S.D. Fla. Oct. 23, 2017)(citing *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1310 (11th Cir. 2009)(citing 15 U.S.C. § 1681n(a))).  "Recklessness" generally requires "action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68, 127 S. Ct. 2201, 167 L. Ed. 2d 1045 (2007)(quotation marks omitted).  "Thus, a consumer reporting agency acts in reckless disregard of FCRA requirements if its 'action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.'" *Williams v. First Advantage LNS Screening Sols., Inc.*, 947 F.3d 735, 745 (11th Cir. 2020)(quoting *Safeco*, 551 U.S. at 69).  Recklessness requires conduct that is at least "objectively unreasonable." *Safeco*, 551 U.S. at 68-69.  Willfulness is typically understood to be a question of fact for the jury.  *Cowley v. Burger King Corp.*, No. 07-21772-CIV, 2008 U.S. Dist. LEXIS 87852, at *12-14 (S.D. Fla. May 23, 2008)(citing cases).

At this early stage in the litigation, without any discovery on Defendant's policies and procedures and its practices of following them, the facts allow this court to draw the reasonable inference that Defendant's conduct in continuing to publish the inaccurate information was willful.  Other courts examining similar claims have found willfulness at the motion to dismiss stage based on the absurdity of the proposition that a credit bureau could continue publishing a tradeline reflecting a current delinquency on an account that had been closed with a $0 balance. *See Friedman*, No. 18 CV 11173 (VB), 2019 U.S. Dist. LEXIS 149706 at *9 (relying on the plaintiff's allegations that had the defendant furnisher conducted a reasonable investigation, it

would have realized that it was "nonsensical and wrong" to report a tradeline with a $0 balance

that was currently 120 days late, and concluding, "[P]laintiff's allegations plausibly suggest

CitiMortgage acted in a way that, at the very least, created an unjustifiably high risk of harm that

was either known or so obvious that it should have been known."); *see also Huggins*, Civil

Action No. 19-21731 (ES) (CLW), 2020 U.S. Dist. LEXIS 229290 at *20-21 (holding same, and

noting that the credit report itself may be sufficient to put the defendant furnisher on notice that it

was violating the law without controlling caselaw directly on point).  Publishing a tradeline

reflecting an ongoing delinquency on an account that has been closed and transferred and has a

$0 balance, something that is completely antithetical to the very nature of accurate reporting,

unquestionably shows willfulness.

Defendant argues that Plaintiff has brought up no policies or procedures or Defendant's

practices that would justify a finding of willfulness, *see e.g. Williams*, 947 F.3d at 745

(discussing willfulness in the context of §1681e(b), requiring consumer reporting agencies to

"…follow reasonable procedures to assure maximum possible accuracy of the information

concerning the individual about whom the report relates."), but at this early stage of the

litigation, without proper discovery on the issue, Plaintiff would simply be unable to.  As one

court explained,

> It is not improper for a plaintiff to rely on the same basic facts to allege alternative claims
> for willful or negligent violations of the same statute. *See Levine v. World Fin. Network
> Nat'l Bank*, 437 F.3d 1118, 1123 (11th Cir. 2006)(the "FCRA provides for civil liability
> both for willful and negligent noncompliance.'). The degree of knowledge involved in the
> alleged violations is a matter uniquely within the defendant's possession, and the plaintiff
> may not be capable of any more definite factual assertion prior to discovery.

*See Ellis v. Equifax Info. Servs., LLC*, No. 1:18-cv-5185-TCB-CMS, 2019 U.S. Dist. LEXIS

184904, at *11-12 (N.D. Ga. June 6, 2019).

Moreover, as *Ellis* went on to explain, Plaintiff has gone beyond merely alleging facts supporting a generalized violation of the statute, but has specifically alleged that Transunion failed to fix a fairly obvious error in Plaintiff's credit report that should have been noticed after conducting a reasonable investigation – facts themselves which support a finding of willfulness. *See Ellis*, No. 1:18-cv-5185-TCB-CMS, 2019 U.S. Dist. LEXIS 184904, at \*12 ("That is not to say, however, that the Complaint in this case lacks any factual allegations to support a claim of willfulness. Here, Plaintiff alleges, albeit in a generalized fashion, that there was a fairly obvious error on her credit report, and that despite being made aware of the error, Trans Union did not fix it."). "These facts go beyond a mere recitation of the elements of the alleged violation and are sufficient to inform Trans Union of the basis for Plaintiff's claims." No. 1:18-cv-5185-TCB-CMS, 2019 U.S. Dist. LEXIS 184904, at \*12.

Defendant's arguments point to the reason why courts typically reserve willfulness as a question of fact for the jury. *See Gross v. Advanced Disposal Servs.*, No. 8:17-cv-1920-T-36TGW, 2018 U.S. Dist. LEXIS 226038, at \*25 (M.D. Fla. Dec. 10, 2018)("The Court will not decide [the issue of willfulness under the FCRA] as it is premature. Many cases analyzing this issue do so on summary judgment by reviewing the evidence regarding the defendant's research and interpretation of the FCRA and ultimately have held that the issue is one for the jury.")(citing cases); *see also Cowley*, No. 07-21772-CIV, 2008 U.S. Dist. LEXIS 87852, at \*12-14 (noting same and citing cases).

Defendant also argues that "[n]either the failure to correct alleged errors after receiving notification of an alleged inaccuracy in a consumer's file, nor the mere existence of inaccuracies in a consumer's report alone, can amount to willful noncompliance with the FCRA." *See* Dkt. # 24, at 21. "That may be. However, courts [] have only so held when deciding motions for

summary judgment or at subsequent stages of litigation." *Friedman*, No. 18-cv-11173, 2019

U.S. Dist. LEXIS 149706, 2019 WL 4194350, at *10 (citing cases); *see also Gross*, No. 8:17-cv-

1920-T-36TGW, 2018 U.S. Dist. LEXIS 226038, at *25 (determining that willfulness is a

question of fact for the jury in the Eleventh Circuit and citing cases); *see also Cowley*, No. 07-

21772-CIV, 2008 U.S. Dist. LEXIS 87852, at *12-14 (noting same and citing cases).

Accordingly, this argument is without merit.

V.     **CONCLUSION**

For the reasons set forth above, Defendant's motion to dismiss should be denied in its

entirety.

Dated:  March 2, 2022                              Respectfully Submitted,

                                                   */s/ Yaakov Saks*
                                                   Yaakov Saks, Esq.
                                                   One University Plaza, Suite 620
                                                   Hackensack, NJ, 07601
                                                   Tel: 201-282-6500
                                                   Fax: 202-282-6501
                                                   ysaks@steinsakslegal.com
                                                   Pro Hac Vice Admitted

## CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2022, I electronically filed the foregoing with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ Yaakov Saks* _____

Yaakov Saks, Esq.